# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ORANGE**

| | |
|---|---|
| STEPHEN SCHLAUGIES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BON SECOURS COMMUNITY HOSPITAL, GOOD SAMARITAN HOSPITAL, and ST. ANTHONY COMMUNITY HOSPITAL,<br><br>Defendants. | Index No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Stephen Schlaughies brings this Class Action Complaint against Defendants Bon Secours Community Hospital, Good Samaritan Hospital, and St. Anthony Community Hospital (collectively, "Defendants" or "Bon Secours Charity Health System"), and each of their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, members, and/or other related entities, and upon personal knowledge and information and belief, alleges as follows:

## INTRODUCTION

1. This action arises out of the public exposure of the confidential, private information of Defendants' current and former patients, Personally Identifying Information[1] ("PII") and

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government

Protected Health Information ("PHI")[2] (collectively "Private Information"), including of Plaintiff and the Class Members, in a cyberattack on a system operated by Defendants' chosen electronic health record software provider, beginning on or around January 22, 2025 ("the Data Breach").

2. According to Defendants, the Private Information unauthorizedly disclosed in the Data Breach includes patients' names and "information included within patient medical records, such as medical record numbers, doctors, diagnosis, medicines, test results, images, care and treatment."[3] According Defendants' public representations, the Data Breach also involved and exposed Social Security numbers.[4]

---

passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendants, not every type of information included in that definition was compromised in the Data Breach.

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. A "covered entity" is further defined as, *inter alia*, a group health plan. *Id. Covered entity, Health plan*. A "business associate" is defined as, with respect to a covered entity, a person who: "creates, receives, maintains, or transmits protected health information for a function or activity regulated by [HIPAA], including claims processing or administration, data analysis, processing or administration, utilization review, quality assurance, patient safety activities listed at 42 CFR 3.20, billing, benefit management, practice management and repricing…" *Id. Business associate*. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, Dep't for Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 5, 2022). Rhea Medical is clearly a "covered entity," and Cerner is clearly a "business associate," subject to HIPAA, and some of the PHI compromised in the Data Breach is "protected health information," subject to HIPAA.

[3] *See* "Notice of Vendor Incident" available at: https://www.wmchealth.org/locations/bon-secours-community-hospital

[4] *Id.*

3. Defendants operate as a regional health system consisting of multiple hospitals and facilities in New York.

4. The Data Breach was caused by Defendants' collective failures to adequately safeguard the Private Information entrusted to it.

5. Defendants failed to undertake adequate measures to safeguard the Private Information of Plaintiff and the proposed Class Members.

6. Although the Data Breach occurred beginning on January 22, 2025 and was purportedly reported to Defendants on September 29, 2025, Defendants failed to immediately notify and warn current and former patients. Instead, Defendants waited until February 6, 2026 to being provide notice to Plaintiff and the proposed Class.

7. As a direct and proximate result of Defendants' failures to protect current and former patients' sensitive Private Information and warn them promptly and fully about the Data Breach, Plaintiff and the proposed Class Members have suffered widespread injury and damages necessitating Plaintiff seeking relief on a class wide basis.

**PARTIES**

8. Plaintiff Stephen Schlaughies is a natural person and resident and citizen of Orange County, New York. Plaintiff is a former patient of Defendants and received a notice letter informing that him that his Private Information was exposed to unauthorized cybercriminals in the Data Breach.

9. Defendants Bon Secours Community Hospital is a New York non-profit corporation with a principal place of business in Orange County, New York.

10. Defendants Good Samaritan Hospital is a New York non-profit corporation with a principal place of business in Orange County, New York.

11. Defendants St. Anthony Community Hospital is a New York non-profit corporation with a principal place of business in Orange County, New York.

12. Each of the Defendants is a member of Westchester Medical Center Health Network ("WMCHealth").

## JURISDICTION & VENUE

13. The Court has personal jurisdiction over Defendants because, personally or through their agents, Defendants operate, conduct, engage in, or carry on business or business ventures in this State. The Court has jurisdiction pursuant to CPLR § 301, because Defendants maintain their principal places of business in the state of New York and conduct substantial business in the state of New York.

14. Venue is proper in this Court pursuant to CPLR § 503(a) because Defendants maintain their principal place of business in this County, conduct substantial business in this County, and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this County.

## BACKGROUND FACTS

### A. Defendants Collect Sensitive Private Information as Part of Their Business.

15. Defendants require that their patients provide them with their Private Information, which Bon Secours Charity Health System provides to its third party vendor Cerner Corporation ("Cerner") in connection with Cerner providing electronic health record software and services.

16. When Defendants collect Plaintiff's and Class Members' Private Information, they promise to use reasonable care to protect and safeguard the Private Information, from unauthorized disclosure.

17. WMCHealth maintains a Notice of Privacy Practices, which explicitly includes and applies to Defendants, in which Defendants promise to maintain the confidentiality of their patients Private Information. It ensures Plaintiff and Class Members that Bon Secours Charity Health System is "required by law to protect the privacy of health information that may reveal your identity, and to provide you with a copy of this notice that describes the health information privacy practices of our hospital, its medical staff, and affiliated health care providers that jointly provide health care services with our hospital."[5] In addition, the Notice of Privacy Practices promises to "maintain the privacy of [patients'] protected health information" and to "notify [patients] if a breach occurs that may have compromised the privacy or security of [patient's] identifiable information."[6]

18. None of the purposes for which Defendants may disclose patient Private Information without authorization include the Data Breach which came to pass.

19. Bon Secours Charity Health System represented to its patients that it would take adequately measures to safeguard their Private Information, including ensuring that its business associates undertook adequate measures to safeguard that Private Information. In particular, Bon Secours Charity Health System assures that "[a]ll of our business associates must protect the privacy and security of your health information just as we do."[7]

20. Plaintiff and members of the proposed Class relied on Bon Secours Charity Health System's representations when they agreed to provide their Private Information to Defendants.

---

[5] https://www.wmchealth.org/wp-content/uploads/2026/02/WMCHealth-NPP-HIPAA-2.13.26.pdf
[6] *Id.*
[7] *Id.*

21. Despite their alleged commitments to securing sensitive patient data, Defendants do not follow industry standard practices in securing patients' Private Information and failed to protect the Private Information of Plaintiff and the proposed Class Members from unauthorized disclosure in the Data Breach.

**B. Defendants Failed to Safeguard Private Information, Causing the Data Breach.**

22. On information and belief, according to Defendants, beginning on or around January 22, 2025, Defendants' ERH vendor experienced a cyberattack to its computer information technology systems by an "unauthorized" actor, which resulted in the unauthorized disclosure and exfiltration of patients' Private Information, including names, information within patient medical records, such as medical record numbers, doctors, diagnosis, medicines, test results, images, care and treatment, and Social Security numbers.[8]

23. Nevertheless, Defendants waited more than a ***full year*** to inform affected current and former patients of the unauthorized disclosure of their Private Information in the Data Breach.

24. On or about February 6, 2026, Defendants began sending written notice of the Data Breach ("Notice Letters") to affected current and former patients, including Plaintiff and Class Members.

25. The Notice Letters advised, among other things:

> **WHAT HAPPENED.** On September 29, 2025, the vendor informed us that an unauthorized third party gained access to legacy Cerner systems as early as January 22, 2025, and ***obtained*** certain data. The vendor informed us that, upon learning of the incident, it initiated its critical incident response process, took steps to secure the impacted systems, began an investigation and engaged external cybersecurity specialists. The vendor also informed us that law enforcement investigators directed them to delay notifying hospital customers and patients about this incident because it could have impeded their investigation.[9] [Emphasis added].

---

[8] *See* "Notice of Vendor Incident" available at: https://www.wmchealth.org/locations/bon-secours-community-hospital
[9] *See* Breach Letter, attached hereto as Exhibit 1.

26. Defendants' conduct, by acts of commission or omission, caused the Data Breach, including: Cerner's failures to implement best practices and comply with industry standards concerning computer system security to adequately safeguard patient Private Information, allowing Private Information to be accessed and stolen, and by failing to implement security measures that could have prevented, mitigated, or timely detected the Data Breach, and by failing to adequately train its employees on cybersecurity policies, enforce those policies, or maintain reasonable security practices and systems, resulting in the Data Breach; as well as Bon Secours Charity Health System's failure to ensure its business associate Cerner undertook these data security measures and appropriate employee training, prior to Bon Secours Charity Health System providing Cerner with Plaintiff's and the Class Members' Private Information.

27. On information and belief, as more fully articulated below, Plaintiff and the members of the proposed Class Members' Private Information, was unauthorizedly disclosed to, and actually "obtained by," third-party cybercriminals in the Data Breach, has now or will imminently be posted to the Dark Web for public viewing and use, in the public domain, and/or utilized for criminal and fraudulent purposes and misuse.

**C. Plaintiff's Experience**

28. Plaintiff is a former patient of Bon Secours Charity Health System who received treatment from Bon Secours Charity Health System prior to the Data Breach.

29. As a condition of receiving Bon Secours Charity Health System's medical services, Plaintiff was required to provide his Private Information to Bon Secours Charity Health System, including but not limited to Plaintiff's name, address, date of birth, Social Security number, financial account information, and medical information which Bon Secours Charity Health System then provided to Cerner in connection with Cerner's electronic records software and services.

30. Plaintiff typically takes measures to protect his Private Information and is very careful about sharing his Private Information. Plaintiff has never knowingly transmitted unprotected Private Information over the internet or other unsecured source. Plaintiff stores any documents containing his Private Information in a safe and secure location, and he diligently chooses unique usernames for his passwords and online accounts.

31. In entrusting his Private Information to Defendants, Plaintiff believed that, as part of the payments for medical treatment and services, Defendants would adequately safeguard that information. Had Plaintiff known that Cerner did not utilize reasonable data security measures, and that Bon Secours Charity Health System did not ensure Cerner utilized reasonable data security measures, Plaintiff would not have entrusted his Private Information to Defendants, or would have paid less for the treatments and services he received.

32. Plaintiff received a Notice Letter from Defendants informing that his Private Information was specifically identified as having been compromised in the Data Breach.

33. As a direct and proximate result of the Data Breach permitted to occur by Defendants, Plaintiff has suffered, and imminently will suffer, injury-in-fact and damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web; Plaintiff has been and will be forced to expend considerable time and effort to monitor his accounts and credit files, changing his online account passwords, verifying the legitimacy of Defendants' Data Breach Notice and researching the Data Breach, to protect himself from identity theft and fraudulent misuse of his Private Information, disclosed as a result of the Data Breach.

34. In addition, as a result of the Data Breach, Plaintiff also suffered diminution in the value of his Private Information, a form of intangible property that he entrusted to Defendants for the sole purpose of obtaining medical services.

35. Furthermore, Plaintiff has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information in the Data Breach. Plaintiff fears for his personal financial security and uncertainty over the information disclosed in the Data Breach, and is experiencing emotional distress over the unauthorized disclosure of his Private Information. He is experiencing feelings of anxiety, embarrassment, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

36. Plaintiff was highly disturbed by the Data Breach's nature and the thought of cybercriminals accessing his highly sensitive Private Information and the harm caused by the Data Breach. He was also outraged that Defendants took more than four months to notify him of the Data Breach after it was discovered by Defendants in September 2025.

37. As a result of the Data Breach, Plaintiff faces a lifetime risk of identity theft, as his compromised Private Information includes sensitive information that cannot be changed.

38. Furthermore, Plaintiff's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff to the prospect of additional harm.

### C. This Data Breach was Foreseeable to Defendants.

39. Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

40. By failing to do so, Defendants put Plaintiff and Class Members at risk of identity theft, financial fraud, and other harms.

41. Defendants tortiously, or in breach of their implied contracts, failed to take the necessary precautions required to safeguard and protect the Private Information of Plaintiff and the Class Members from unauthorized disclosure. Defendants' actions represent a flagrant disregard of Plaintiff's and the other Class Members' rights.

42. Plaintiff and Class Members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

43. According to a Chief Strategy Officer at ClearDATA, "[i]t's no secret that healthcare is the industry most plagued by data breaches. Patient data is the most valuable, making it targeted by bad actors."[10]

44. Moreover, healthcare companies are targeted because of their cybersecurity vulnerabilities: "…healthcare is also targeted because it is very vulnerable. Many healthcare providers use outdated IT infrastructure and operating systems that can no longer be patched or supported, such as Windows 7 and Windows Server 2008, even after Microsoft retired them.

---

[10] Sanjay Cherian, Forbes Magazine, "Healthcare Data: The Perfect Storm," January 14, 2022, available at https://www.forbes.com/sites/forbestechcouncil/2022/01/14/healthcare-data-the-perfect-storm/?sh=28523ee56e88 (last accessed. June 19, 2023).

Further, more than half of medical devices operate on legacy systems, and 83% of medical imaging devices are on outdated operating systems that no longer receive patches/updates. This creates significant cybersecurity vulnerabilities and makes it much easier for bad actors to find an entry point into the network."[11]

45. Cyber-attacks against healthcare organizations such as Defendants are targeted and frequent. According to the 2019 Health Information Management Systems Society, Inc. ("HIMMS") Cybersecurity Survey, "[a] pattern of cybersecurity threats and experiences is discernable across U.S. healthcare organizations. Significant security incidents are a near-universal experience in U.S. healthcare organizations with many of the incidents initiated by bad actors…"[12]

46. In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.[13]

47. Of the 1,473 recorded data breaches, 525 of them, or 35.64%, were in the medical or healthcare industry.[14]

48. According to the Identity Theft Resource Center's January 24, 2022 report for 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506)

---

[11] *Id.*
[12] HEALTHCARE INFORMATION AND MANAGEMENT SYSTEMS SOCIETY, *2019 HIMSS Cybersecurity Survey*, available at https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf (last accessed December 7, 2022)
[13] https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last accessed Dec. 7, 2022)
[14] *Ibid.*

set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[15]

49. According to the ITRC's January 2023 report for 2022, "[t]he number of publicly reported data compromises in the U.S. totaled 1,802 in 2022. This represents the second highest number of data events in a single year and just 60 events short of matching 2021's all-time high number of data compromises."[16] In 2022, there were approximately 422 million individuals affected by cyberattacks.[17]

50. Moreover, of the 1,802 data breaches in 2022, ITRC reported that 1,560 involved compromised names, 1,143 involved compromised of Social Security Numbers, and 633 involved compromised dates of birth—types of Private Information included in the unauthorized disclosure in this Data Breach.[18]

51. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[19]

52. Furthermore, Defendants were aware of the risk of data breaches because such breaches have dominated the headlines in recent years. For instance, the 525 reported medical or healthcare data breaches reported in 2019 exposed nearly 40 million sensitive records

---

[15] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," Jan. 24, 2022, available at https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ (last accessed Apr. 14, 2023).

[16] Identity Theft Resource Center, 2022 Data Breach Report, available at https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf, pg. 7 (last accessed Jul. 3, 2023).

[17] *See Id.*, pg. 2.

[18] *Id.*, pg. 6.

[19] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last accessed Apr. 14, 2023).

(39,378,157), compared to only 369 breaches that exposed just over 10 million sensitive records (10,632,600) in 2018.[20]

53. According to the U.S. Department for Health and Human Services' "2022 Healthcare Cybersecurity Year in Review, and a 2023 Look-Ahead," "[h]ealthcare data breaches have doubled in 3 years."[21]

54. Private Information is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used for a variety of unlawful and nefarious purposes, including ransomware and fraudulent misuse, and sale on the Dark Web.

55. Private Information can be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and medical records. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.

56. Given the nature of the Data Breach, it was foreseeable that the compromised Private Information could be used by hackers and cybercriminals in a variety of different injurious ways. Indeed, the cybercriminals who possess the Class Members' Private Information can easily obtain Class Members' tax returns or open fraudulent credit card accounts in the Class Members' names.

---

20 https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last accessed Dec. 7, 2022), at pg. 15.
21 U.S. Department for Health and Human Services, The Health Sector Cybersecurity Coordination Center (HC3), "2022 Healthcare Cybersecurity Year in Review, and a 2023 Look-Ahead," February 9, 2023, avail. at https://www.hhs.gov/sites/default/files/2022-retrospective-and-2023-look-ahead.pdf

**D. Defendants Failed to Comply with FTC Guidelines.**

57. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

58. In 2016, the FTC updated its publication, *Protecting PII: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of PII/PHI that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[22]

59. The FTC further recommends that companies not maintain PII/PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[23]

---

[22] *See* Federal Trade Commission, October 2016, "Protecting Private information: A Guide for Business," available at https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf (last acc. Apr. 14, 2023).
[23] *See id.*

60. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

61. These FTC enforcement actions include actions against healthcare providers failing to safeguard Private Information, such as Defendants. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

62. Cerner failed to properly implement basic data security practices widely known throughout the industry, and Bon Secours Charity Health System failed to ensure its business associate, Cerner, implemented these practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patient Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**E. Defendants Violated HIPAA.**

63. Bon Secours Charity Health System is a covered businesses under HIPAA (45 C.F.R. § 160.102) and required to comply with the HIPAA Privacy Rule and Security Rule, 45

C.F.R. Part 160, Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and C.

64. Bon Secours Charity Health System is further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. See 42 U.S.C. §17921; 45 C.F.R. § 160.103.

65. HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting PHI that is kept or transferred in electronic form.

66. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

67. HIPAA's Security Rule required and requires that Bon Secours Charity Health System do the following:

1. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;
2. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;
3. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and
4. Ensure compliance by its workforce.

68. HIPAA also required and requires Bon Secours Charity Health System to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Bon Secours Charity Health System is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

69. HIPAA and HITECH also require procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. See 45 C.F.R. § 164.306(a)(1), (a)(3).

70. HIPAA further requires covered entities like Bon Secours Charity Health System to have and apply appropriate sanctions against members of their workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

71. HIPAA further requires covered entities like Bon Secours Charity Health System to mitigate, to the extent practicable, any harmful effect that is known to the entity of a use or disclosure of PHI in violation of the entity's policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. See 45 C.F.R. § 164.530(f).

72. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. See 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost

effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."

73. HIPAA's Breach Notification Rule further requires that within 60 days of discovering a breach of unsecured patient PHI, as is this Data Breach, Bon Secours Charity Health System must notify each individual affected regarding the nature of the breach, the PHI compromised, steps the individual should take to protect against potential resulting harm, and what Insurer Defendants are doing to protect against future breaches. 45 C.F.R. § 164.404(b).

74. Additionally, Cerner is a business associate as defined under HIPAA. 45 C.F.R. § 160.103.

75. HIPAA requires that when a covered entity, like Bon Secours Charity Health System, provides PHI to a business associate, like Cerner, the covered entity must require by contract and ensure that the business associate uses appropriate safeguards to protect electronic PHI from unauthorized disclosure. 45 C.F.R. § 164.504(e)(2)(ii).

76. As alleged herein, Defendants violated HIPAA and HITECH. They (a) failed to maintain adequate security practices, systems, and protocols to prevent data loss, (b) failed to mitigate the risks of a data breach, (c) failed to ensure the confidentiality and protection of PHI, (d) failed to require or ensure that Cerner used appropriate safeguards to prevent the unauthorized disclosure of Plaintiff's and Class Members' Private Information, and (e) failed to provide the required Data Breach notice within 60 days of discovering the incident.

**F. Defendants Failed to Comply with Industry Standards**

77. As shown above, experts studying cyber security routinely identify organizations holding Private Information as being particularly vulnerable to cyber-attacks because of the value of the information they collect and maintain. As of 2022, ransomware breaches like that which occurred here had grown by 41% in the last year and cost on average $4.54 million dollars.[24]

78. A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security's (CIS) CIS Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[25]

79. In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

- Control who logs on to your network and uses your computers and other devices.

---

[24] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last accessed Apr. 14, 2023).
[25] *See* https://www.rapid7.com/solutions/compliance/critical-controls/ (last accessed Apr. 14, 2023).

- Use security software to protect data.
- Encrypt sensitive data, at rest and in transit.
- Conduct regular backups of data.
- Update security software regularly, automating those updates if possible.
- Have formal policies for safely disposing of electronic files and old devices.
- Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.[26]

80. Upon information and belief, Defendants failed to implement industry standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

**F. The Data Breach Caused Plaintiff and Class Members Injuries and Damages.**

81. Plaintiff and Class Members have suffered injury and damages from the unauthorized disclosure of their Private Information in the Data Breach that can be directly traced to Cerner's failure to adequately protect that Private Information, and Bon Secours Charity Health

[26] Understanding The NIST Cybersecurity Framework, https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last acc. Apr. 14, 2023).

System's failures to ensure Cerner adequately protected that Private Information, that has occurred, is ongoing, and/or imminently will occur.

82. As stated prior, in the Data Breach, unauthorized cybercriminals were able to access the Plaintiff's and the proposed Class Members' Private Information, which on information and belief is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale, causing widespread injury and damages.

83. The ramifications of Defendants' failure to keep Plaintiff's and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

84. Because Defendants collectively failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the Class Members have suffered, are at an increased risk of suffering, or will imminently suffer:

a. exposure of that Private Information, including said information being posted on the dark web for fraudulent, criminal activity or sale;

b. fraudulent misuse of Private Information, including fraudulent loans taken out using Private Information acquired in the Data Breach, fraudulent cellular telephone accounts taken out using Private Information acquired in the Data Breach; and, identity theft and impersonation using Private Information acquired in the Data Breach;

c. Malware, and increase in spam emails;

d. The loss of the opportunity to control how Private Information is used;

e. The diminution in value of their Private Information;

f. The compromise and continuing publication of their Private Information;

g. Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

h. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

i. Emotional Distress;

j. Delay in receipt of tax refund monies;

k. Unauthorized use of stolen Private Information; and

l. The continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Cerner fails to undertake the appropriate measures to protect the Private Information in its possession, and Bon Secours Charity Health System to ensure Cerner undertakes these measures.

85. Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

86. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts;

time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.[27]

87. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[28]

88. The time-consuming process recommended by the FTC and other experts is complicated by the vulnerable situations of Defendants' patients.

89. Identity thieves use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

90. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

---

[27] *See* Gaetano DiNardi, Aura.com, "How Bad Is Identity Theft? Is It Serious?" (December 14, 2022) available at https://www.aura.com/learn/dangers-of-identity-theft#:~:text=Fraudsters%20can%20open%20new%20accounts,to%20repair%20your%20credit%20score (last accessed Feb. 27, 2023).

[28] *See* https://www.identitytheft.gov/Steps (last accessed September 1, 2021).

91. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's Private Information to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

92. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated. [29]

93. What's more, theft of Private Information is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, Private Information is a valuable property right.[30]

94. The value of sensitive information is axiomatic; one need only consider the value of Big Data in corporate America, or that the consequences of cyber theft include heavy prison

---

[29] *See* Jason Steele, *Credit Card and ID Theft Statistics*, CreditCards.com (June 11, 2021), avail. at https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ citing Identity Theft Resource Center, "2021 Consumer Aftermath Report," May 26, 2021 available at https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/ (last accessed Feb. 27, 2023).

[30] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private information") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

sentences. Even the obvious risk to reward analysis of cybercrime illustrates beyond doubt that Private Information has considerable market value.

95. Theft of Private Information, in particular, is problematic because: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[31]

96. Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed Private Information to adjust their insureds' medical insurance premiums.

97. It must also be noted there may be a substantial time lag–measured in years–between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

98. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

99. Where the most Private Information belonging to Plaintiff and Class Members was accessible from Cerner's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market,

---

[31] *See Medical Identity Theft, Federal Trade Commission Consumer Information* (last visited: June 7, 2022), http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

105. Thus, Plaintiff and the Class Members must vigilantly monitor their financial and medical accounts for many years to come.

106. According to cybersecurity experts, "[r]eports show the value of a health record can be worth as much as $1,000, whereas on the dark web, a credit card number is worth $5 and Social Security numbers are worth $1."[32]

107. Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud.[33]

108. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[34] Each of these fraudulent activities is difficult to detect. An individual may not know that his or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's

---

[32] Sanjay Cherian, Forbes Magazine, "Healthcare Data: The Perfect Storm," January 14, 2022, available at https://www.forbes.com/sites/forbestechcouncil/2022/01/14/healthcare-data-the-perfect-storm/?sh=28523ee56c88 (last accessed June 19, 2023).
[33] *See* U.S. Social Security Administration, "Identity Theft and Your Social Security Number," Publication No. 05-10064, July 2021, available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Feb. 25, 2023)
[34] *See id.*

employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

109. Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[35]

110. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[36] Medical information is especially valuable to identity thieves. The asking price on the Dark Web for medical data is $50 per person and up.[37]

111. Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein, specifically the imminent identity fraud and criminal fraudulent activity; lost time and efforts in remediating the impact of the Data Breach, and other injury and damages as set forth in the preceding paragraphs.

---

[35] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, [redacted] millions-worrying-about-identity-theft (last accessed September 1, 2021).
[36] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed September 1, 2021).
[37] *See* Omri Toppol, *Email Security: How You Are Doing It Wrong & Paying Too Much*, LogDog (Feb. 14, 2016), https://getlogdog.com/blogdog/email-security-you-are-doing-it-wrong/ (last accessed September 1, 2021).

112. Defendants knew or should have known of these harms which would be caused by the Data Breach they permitted to occur, and Cerner should have strengthened its data systems accordingly, and Bon Secours Charity Health System should have ensured that Cerner did so before entrusting Plaintiff's and Class Members' Private Information to Cerner.

## CLASS ACTION ALLEGATIONS

113. Plaintiff brings this action on behalf of himself and on behalf of a proposed class of all other persons similarly situated, under CPLR 901, *et seq*.

114. Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> **Nationwide Class:**
> All persons residing in the United States whose Private Information was compromised as a result of the Data Breach, including all persons who received notice of the breach (the "Class").
>
> **New York Subclass:**
> All persons residing in the State of New York whose Private Information was compromised as a result of the Data Breach, including all persons who received notice of the breach.

115. Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and Members of their staff.

116. Plaintiff reserves the right to amend or modify the Class definitions as this case progresses.

117. Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time,

based on information and belief, the Class consists of thousands of individuals whose sensitive data was compromised in the Data Breach.

118. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. if Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b. if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. if Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e. if Defendants owed a duty to Class Members to safeguard their Private Information;

f. if Defendants breached their duty to Class Members to safeguard their Private Information;

g. if Defendants knew or should have known that their data security systems and monitoring processes were deficient;

h. if Defendants should have discovered the Data Breach sooner;

i. if Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

j. if Defendants' conduct was negligent;

k. if Defendants' breach implied contracts with Plaintiff and Class Members;

l. if Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m. if Defendants failed to provide notice of the Data Breach in a timely manner, and;

n. if Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

119. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

120. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

121. Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

122. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class

Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

123. Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

124. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. if Defendants failed to timely notify the public of the Data Breach;

b. if Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. if Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d. if Defendants' failure to institute adequate protective security measures amounted to negligence;

e. if Defendants failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. if adherence to FTC and/or HIPAA data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

125. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class against Defendants)**

126. Plaintiff repeats and re-alleges paragraphs 1 through 124 and incorporates them by reference herein.

127. Plaintiff and the Class Members entrusted their Private Information to Bon Secours Charity Health System, and other medical providers, who entrusted the Private Information to Cerner to perform medical billing services.

128. Defendants owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using the Private Information in their care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

129. Further, Bon Secours Charity Health System owed to Plaintiff a duty to exercise reasonable care in supervising Cerner to ensure Cerner adequately protected the Private Information which Bon Secours Charity Health System had entrusted to Cerner.

130. Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure to collectively adequately safeguard the Private Information

in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that Private Information—just like the Data Breach that ultimately came to pass. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and members of the Class's Private Information by disclosing and providing access to this information to third parties and by failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

131. Defendants owed to Plaintiff and Class Members a duty to notify them within a reasonable timeframe of any breach to the security of their Private Information. Defendants also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

132. Defendants owed these duties to Plaintiff and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from said Defendants' inadequate security protocols. Defendants actively sought and obtained Plaintiff's and members of the Class's Private Information.

133. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendants collect and hold vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access

their databases containing the Private Information—whether by a sophisticated cyberattack or otherwise.

134. Private Information is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiff and Class Members and the importance of exercising reasonable care in handling it, and of Bon Secours Charity Health System in supervising Cerner's handling of that information.

135. Defendants breached their duties by failing to exercise reasonable care in supervising its agents, employees, contractors, vendors, and suppliers, and in handling and securing the Personally Information of Plaintiff and Class Members, and by Bon Secours Charity Health System failing to ensure Cerner did so, which actually and proximately caused the Data Breach and Plaintiff's and Class Members' injury-in-fact and damages.

136. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

137. As a direct, proximate, and traceable result of Defendants' negligence, Plaintiff has suffered or will imminently suffer injury-in-fact and damages, as set forth in the preceding paragraphs.

138. Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including: exposure of that Private Information, including being posted on the Dark Web for fraudulent, criminal activity or sale; fraudulent misuse of Private Information including fraudulent loans, fraudulent cellular telephone accounts, and identity theft

and impersonation using Private Information acquired in the Data Breach; malware, and increase in spam emails; loss of the opportunity to control how Private Information is used; diminution in value of their Private Information; compromise and continuing publication of their Private Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; emotional Distress; delay in receipt of tax refund monies; unauthorized use of stolen Private Information; the continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Cerner fails to undertake the appropriate measures to protect the Private Information in its possession, and Bon Secours Charity Health System fails to ensure Cerner undertakes these measures; and, an increased risk of fraud and identity theft.

139. In addition, pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's Private Information.

140. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect customers or, in this case, patients' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff's and the members of the Class's sensitive Private Information.

141. Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., Defendants had the further duty to implement reasonable safeguards to protect Plaintiff's and Class Members' PHI from unauthorized disclosure.

142. Pursuant to HIPAA, Bon Secours Charity Health System had a duty to require Cerner implement reasonable data security measures for the PHI in its care, including by, *e.g.*, rendering the electronic PHI it maintained in a form unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304.

143. Additionally, pursuant to HIPAA, Defendants had a duty to provide notice of the Data Breach within 60 days of discovering it. *See* 42 C.F.R. § 2.16(b); 45 C.F.R. § 164.404(b).

144. Defendants violated their respective duties under Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Plaintiff's and the Class's Private Information and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to patients in the event of a breach, which ultimately came to pass.

145. The harm that has occurred is the type of harm the FTC Act and HIPAA are intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class Members.

146. Plaintiff and Class Members, as patients and consumers furnishing their Private Information to Defendants, are among the individuals whom the FTC Act and HIPAA are meant to protect.

147. Defendants had a duty to Plaintiff and the Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and the Class's Private Information, and Bon Secours Charity Health System had the duty to supervise Cerner, to ensure it did so.

148. Defendants breached their respective duties to Plaintiff and members of the Class under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's Private Information.

149. Defendants' violations of the FTC Act and HIPAA constitute negligence *per se*.

150. As a result of the negligence of Defendants, Plaintiff and the Class Members are entitled to recover actual, compensatory, and punitive damages.

151. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) properly notify affected victims of the Data Breach (ii) strengthen their data security systems and monitoring procedures; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) provide adequate credit monitoring to all Class Members.

152. Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class Members in that the Private Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class Members have no adequate

remedy at law for the injuries in that a judgment for monetary damages will not end the exposure of the Private Information of Plaintiff and the Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class against Defendants)**

153. Plaintiff repeats and re-alleges paragraphs 1 through 124 and incorporates them by reference herein.

154. Defendants Bon Secours Charity Health System offered to provide medical services to Plaintiff and the Class Members in exchange for their Private Information and in exchange for amounts paid for medical treatment and services that included payment for data security.

155. Bon Secours Charity Health System entrusted the Private Information of Plaintiff and the proposed Class Members to Cerner, their business associate, in order for Cerner to perform medical billing services.

156. Plaintiff and the Class Members accepted Defendants Bon Secours Charity Health System's offer by providing Private Information to Bon Secours Charity Health System, and in turn to Cerner, in exchange for medical services.

157. In turn, and through the Notice of Privacy Practices described in the preceding paragraphs, and other conduct and representations, Defendants agreed they would not disclose the Private Information they collect to unauthorized persons and that they would safeguard patient Private Information, including by Private Information supervising their business associate, Cerner, to ensure it adequately safeguarded patient Private Information.

158. Implicit in the parties' agreement was that Defendants would provide Plaintiff and the Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

159. Plaintiff and the Class Members would not have entrusted their Private Information to Defendants in the absence of such an agreement with Bon Secours Charity Health System, and Cerner.

160. Defendants materially breached the contract(s) each had entered into with Plaintiff and the Class Members by failing to safeguard their Private Information, including by Bon Secours Charity Health System failing to supervise Cerner to ensure it properly safeguarded their Private Information, and by failing to notify them promptly of the Data Breach to Cerner's computer systems that compromised such information. Bon Secours Charity Health System further breached the implied contracts with Plaintiff and the Class Members by:

161. Failing to properly safeguard and protect Plaintiff's and members of the Class's Private Information, including Bon Secours Charity Health System failing to properly supervise Cerner to ensure it safeguarded the Private Information entrusted to it;

162. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

163. Failing to ensure the confidentiality and integrity of electronic Private Information that Defendants created, received, maintained, and transmitted.

164. The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendants' material breaches of its agreement(s).

165. Plaintiff and the Class Members have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendants.

166. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in

connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

167. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

168. Defendants failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

169. In these and other ways, Defendants violated their duties of good faith and fair dealing.

170. Plaintiff and the Class Members have sustained injury-in-fact and damages because of Defendants' breaches of their agreements, including breaches thereof through violations of the covenant of good faith and fair dealing.

171. As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and the proposed Class Members and are entitled to actual, compensatory, and consequential damages.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class against Defendants)**

172. Plaintiff repeats and re-alleges paragraphs 1 through 124 of this Complaint and incorporates them by reference herein.

173. Plaintiff and the Class Members conferred a benefit upon Defendants in the form of monies paid for medical treatment services and by providing their Private Information to Defendants in order to receive such services.

174. Defendants appreciated or had knowledge of the benefits conferred upon themselves by Plaintiff and the Class Members.

175. As a result of Defendants' conduct, Plaintiff and members of the Class suffered actual damages in an amount equal to the difference in value between the purchases made with reasonable data privacy and security practices and procedures that Plaintiff and the Class Members paid for, and the purchases without unreasonable data privacy and security practices and procedures that they received.

176. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and the proposed Class Members' payments and their Private Information because Defendants failed to adequately protect their Private Information, and because Bon Secours Charity Health System failed to properly supervise Cerner to ensure it protected Plaintiff's and the Class Members' Private Information. Plaintiff and the Class Members would not have provided their Private Information, nor used and paid for Defendants' services, had they known Defendants would not adequately protect their Private Information.

177. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by it because of its misconduct and the Data Breach alleged herein.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class against Defendants)**

178. Plaintiff repeats and re-alleges paragraphs 1 through 124 and incorporates them by reference herein.

179. In light of their special relationship as a medical provider, Defendants became the guardians of Plaintiff's and Class members' PII/PHI. Defendants became a fiduciary, created by their undertaking and guardianship of Plaintiff's and the Class Members' current and former PII/PHI, to act primarily for the benefit of Plaintiff and Class members. This duty included the obligation and responsibility to safeguard Plaintiff's and Class members' PII/PHI, to timely detect and notify them in the event of a data breach, utilizing third-party vendors capable of adequately securing Plaintiff's and Class Members' Private Information, and establish and implement appropriate oversight procedures for the activities of its business associate, NRS.

180. At all relevant times hereto, Defendants owed, and owes, a fiduciary duty to Plaintiff and the Class, including its duty to keep Plaintiff and Class Members' Private Information reasonably secure.

181. The fiduciary duty to patients is explicated under the procedures set forth in the Health Insurance Portability and Accountability Act Privacy Rule, including, without limitation the procedures and definitions of 45 C.F.R. §160.103 and 45 C.F.R. §164.530, which required Defendants to apply appropriate administrative, technical, and physical safeguards to protect the privacy of patient information and to secure the health care information it maintains and to keep it free from disclosure.

182. Defendants breached its fiduciary duty to Plaintiff by failing to implement sufficient safeguards and by allowing Plaintiff's and other Class Members' Private Information to be disclosed to unauthorized third parties.

183. As a direct result of Defendants' breach of its fiduciary duty of confidentiality and the disclosure of Plaintiff's confidential Private Information, Plaintiff and the Class Members have suffered damages.

184. As a direct result of Defendants' breach of its fiduciary duty and the disclosure of Plaintiff's and Class Members' Private Information, Plaintiff and the Class have suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy, confidentiality, embarrassment, emotional distress, and humiliation.

185. Plaintiff and the other Class Members suffered and will continue to suffer damages including, but not limited to: (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of the Private Information; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; (vii) loss of the benefit of the bargain; and (viii) emotional distress. At the very least, Plaintiff and the Class are entitled to nominal damages.

## COUNT V
## NEGLIGENT HIRING AND SUPERVISION
## (On Behalf of Plaintiff and the Class against Defendants)

186. Plaintiff repeats and re-alleges paragraphs 1 through 124 and incorporates them by reference herein.

187. At all relevant times, Cerner was acting as Defendants' agent. Bon Secours Charity Health System granted Cerner access to the PII and PHI of Plaintiff and the Class without properly vetting Cerner, inquiring about or investigating Cerner's data security, training Cerner, advising Cerner of its duties owed to Plaintiff and the Class under the HIPAA and applicable industry standards, and/or advising Cerner of the confidential nature of Plaintiff's and the Class's Private Information.

188. Bon Secours Charity Health System was negligent and failed to exercise the requisite standard of care in the hiring, supervision, and retention of Cerner as a contractor – who disclosed Plaintiff's and the Class's Private Information without authorization and caused the damages delineated herein by virtue of the Data Breach.

189. At all times relevant hereto, Defendants owed a duty to Plaintiff and the Class to train and supervise its agents and third parties handling sensitive Private Information in its possession to ensure they recognized the duties owed to Plaintiff's and the Class to keep their PII safe from data breaches.

190. Bon Secours Charity Health System owed a duty to Plaintiff and the Class to ensure Cerner had adequate data security, procedures, and protocols sufficient to protect Plaintiff's and the Class's Private Information from data breaches prior to hiring Cerner.

191. Bon Secours Charity Health System also owed a continuing duty to Plaintiff and the Class to ensure Cerner continued to employ adequate data security, procedures, and protocols sufficient to protect Plaintiff's and the Class's Private Information from data breaches after hiring Cerner.

192. Bon Secours Charity Health System breached this duty by failing to ensure Cerner possessed the requisite data security, procedures, practices, infrastructure, and protocols to protect

Plaintiff's and the Class's PII from data breaches prior to hiring Cerner and while Cerner worked for Bon Secours Charity Health System.

193. Bon Secours Charity Health System was on notice of the importance of data security because of well publicized data breaches occurring throughout the United States and because of its own prior data breach. Despite knowledge of prior data breaches, Bon Secours Charity Health System failed to ensure Cerner possessed the adequate security posture to protect Plaintiff's and the Class's Private Information from unauthorized disclosure.

194. Further, Defendants was aware of its obligations under HIPAA to ensure that its business associates, such as Cerner, gave satisfactory assurances that they would appropriately secure the PII of Plaintiff and the Class. *See* 45 CFR § 164.308(b)(1-2).

195. Upon information and belief, Defendants failed in this obligation.

196. Bon Secours Charity Health System knew or should have known that the failure to ensure Cerner employed adequate data security, procedures, and protocols would create an unreasonable risk of danger to persons and property and violate the statutory and fiduciary duties it owed to Plaintiff and the Class.

197. As a direct and proximate result of Bon Secours Charity Health System's breach of its duties, and its negligent hiring, training, selection, and supervision, of Cerner, which resulted in the disclosure of Plaintiff's and Class members' confidential PII in the Data Breach, Plaintiff and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy, diminution in value of their PII, and emotional distress.

198. The acts and omissions of Bon Secours Charity Health System in negligently hiring, retaining, training, and/or supervising Cerner are such as to show gross negligence and reckless disregard for the safety of others and, therefore, punitive damages are appropriate.

**COUNT VI**
**VIOLATIONS OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES ACT, N.Y. Gen. Bus. Law § 349 ("GBL")**
**(On Behalf of Plaintiff and the New York Subclass against Defendants)**

199. Plaintiff repeats and re-alleges paragraphs 1 through 124 and incorporates them by reference herein.

200. This claim is brought on behalf of Plaintiff and the New York Class against Defendants.

201. Plaintiff and Class Members are "persons" within the meaning of the N.Y. Gen. Bus. Law ("GBL") § 349(h).

202. Defendants are each a "person, firm, corporation or association or agent or employee thereof" within the meaning of GBL § 349(b).

203. Under GBL Section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce" are unlawful.

204. Bon Secours Charity Health System violated the GBL through its promises to protect, and subsequent failure to adequately safeguard and maintain, Plaintiff's and New York Class Members' Private Information. Bon Secours Charity Health System failed to notify Plaintiff and other Class Members that, contrary to its representations about valuing data security and privacy, it does not maintain adequate controls to protect Private Information. Bon Secours Charity Health System omitted all this information from Plaintiff and New York Class Members.

205. As a result of Bon Secours Charity Health System's above-described conduct, Plaintiff and the New York Class have suffered damages from the disclosure of their information to unauthorized individuals.

206. The injury and harm that Plaintiff and the New York Class suffered was the direct and proximate result of Bon Secours Charity Health System's violations of the GBL. Plaintiff and New York Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information, which remains in Bon Secours Charity Health System's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; and (vii) of overpayment for the services that were received without adequate data security.

207. Plaintiff, individually and on behalf of the New York Class, request that this Court enter such orders or judgments as may be necessary to enjoin Bon Secours Charity Health System from continuing its unfair and deceptive practices.

208. Under the GBL, Plaintiff and New York Class Members are entitled to recover their actual damages or $50, whichever is greater. Additionally, because Bon Secours Charity Health System acted willfully or knowingly, Plaintiff and New York Class Members are entitled to recover three times their actual damages. Plaintiff is also entitled to reasonable attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, individually, and on behalf of all others similarly situated individually, respectfully requests that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing Plaintiff's counsel to represent the Class;

B. Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

C. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

D. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

E. Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting such other or further relief as may be appropriate under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 20, 2026

Respectfully submitted,

*/s/ Alyssa Tolentino*
Alyssa Tolentino (Bar No. 6195481)
Tyler J. Bean*
**SIRI GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
T: (212) 532-1091
E: atolentino@sirillp.com
E: tbean@sirillp.com

A. Brooke Murphy
**MURPHY LAW FIRM**
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
T: (405) 389-4989
E: abm@murphylegalfirm.com

*Counsel for Plaintiff and the Proposed Class*

# EXHIBIT 1

Return Mail Processing
PO Box 589
Claysburg, PA 16625-0589

February 6, 2026

P5233-L01-0089101 P004 T00209 ********SCH 5-DIGIT 10940
STEPHEN SCHLAUGIES
[redacted]

Dear Stephen Schlaugies:

Bon Secours Community Hospital, Good Samaritan Hospital, and St. Anthony Community Hospital (collectively "Bon Secours Charity Health System") are writing to inform you about a recent incident at our electronic health record ("EHR") software vendor, Cerner ("Cerner" or "the vendor"), that may have involved information about you. We want to provide you with information about the incident, steps we are taking in response, and steps you may take to guard against identity theft and fraud, should you feel it is appropriate to do so.

**WHAT HAPPENED.** On September 29, 2025, the vendor informed us that an unauthorized third party gained access to legacy Cerner systems as early as January 22, 2025, and obtained certain data. The vendor informed us that, upon learning of the incident, it initiated its critical incident response process, took steps to secure the impacted systems, began an investigation and engaged external cybersecurity specialists. The vendor also informed us that law enforcement investigators directed them to delay notifying hospital customers and patients about this incident because it could have impeded their investigation.

**WHAT INFORMATION WAS INVOLVED.** On December 10, 2025, the vendor provided us with a list of patients whose information may have been involved in this incident, following a complex data review and analysis. The information involved in this incident may have included your name and information included within patient medical records, such as medical record numbers, doctors, diagnoses, medicines, test results, images, care and treatment.

**WHAT WE ARE DOING.** We began investigating the incident in coordination with the vendor as soon as we learned of it and reported the incident to law enforcement. The security incident occurred at the vendor's IT systems. This incident did **not** involve any of our IT systems and did **not** cause any disruption to our clinical operations or our ability to provide patient care. We remain committed to upholding high standards of custodianship of patient information with our third-party vendors.

**WHAT YOU CAN DO.** Although we are not aware of any information involved in this incident being used for fraud or identity theft, we, along with the vendor, are offering complimentary access to Experian IdentityWorks℠ Credit Plus 3B for 24 months. This product helps detect possible misuse of your personal information and provides identity protection services focused on identification and resolution of identity theft. IdentityWorks℠ is completely free to you and enrolling in this program will not hurt your credit score. For more information on identity theft prevention and IdentityWorks℠ Credit Plus 3B, including instructions on how to activate your complimentary membership, please see the additional information provided with this letter.

Please note that Identity Restoration is available to you for 24 months from the date of this letter and does not require any action on your part at this time. The Terms and Conditions for this offer are located at www.ExperianIDWorks.com/restoration. While identity restoration assistance is immediately available to you, we also encourage you to activate the fraud detection tools available through Experian IdentityWorks as a complimentary 24-month membership. This product provides you with superior identity detection and resolution of identity theft. See Appendix for additional details.

**FOR MORE INFORMATION.** If you have further questions or concerns, or would like an alternative to enrolling online, please call 833-931-7489 toll-free Monday through Friday from 8 am – 8 pm Central (excluding major U.S. holidays). Please be prepared to provide your engagement number B158945.

Sincerely,

**Bon Secours Charity Health System**

0089101